QUINN EMANUEL URQUHART & SULLIVAN, LLP
Ellyde R. Thompson (*pro hac vice* forthcoming)
ellydethompson@quinnemanuel.com
51 Madison Ave 22nd floor
New York, NY 10010
Telephone:     (212) 849-7000
Facsimile:     (212) 849-7100

Victoria B. Parker (Bar No. 290862)
vickiparker@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:     (415) 875-6600
Facsimile:     (415( 875-6700

Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100

*Attorneys for Plaintiff Mursion, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| MURSION, INC,<br><br>        Plaintiff,<br><br>   v.<br><br>ARJUN NAGENDRAN, and RELATIV.AI, INC.,<br><br>       Defendants. | Case No. 23-cv-6373<br><br>**COMPLAINT FOR:**<br><br>**(1) BREACH OF FIDUCIARY DUTY**<br>**(2) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**<br>**(3) FRAUD**<br>**(4) COMPUTER CRIMES (CAL PENAL CODE § 502(C))**<br>**(5) BREACH OF CONTRACT**<br>**(6) VIOLATION OF DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836 *et seq.*)**<br>**(7) VIOLATION OF UNFAIR COMPETITION LAW (CAL. BUS & PROF. CODE § 17200)**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Mursion, Inc. ("Mursion" or "Plaintiff") alleges the following against Defendants Arjun Nagendran ("Nagendran") and Relativ.ai, Inc. ("Relativ.ai") (collectively, "Defendants"):

## INTRODUCTION

1.      This is a case about fraud, disloyalty, and greed.  In 2022 and early 2023, Defendant Nagendran, the former Chief Technology Officer of Mursion—an innovative tech company that trains teachers, healthcare professionals, and corporate leaders on how to handle difficult and high stakes conversations through simulated interactions with avatars in virtual reality sessions—decided to rip-off the company that he had co-founded and to which he owed fiduciary duties by creating a copycat entity and direct competitor, Relativ.ai.

2.      Nagendran did not simply form a competitor after leaving Mursion, he began building it while ***still employed as Mursion's CTO***.  And worse, he fraudulently misrepresented and concealed his activity from his employer while negotiating a generous severance package that not only paid him nearly $200,000 and granted him hundreds of thousands of stock options, but allowed him to retain his seat on Mursion's Board of Directors and continue to have access to Mursion's most closely guarded and sensitive company secrets.

3.      Mursion is on the cutting-edge of the use of artificial intelligence ("AI") to train professionals.  Based on studies that show that people feel far more comfortable practicing difficult conversations—sales pitches, managing subordinate employees, interacting with patients and their loved ones, navigating cultural divides—with digital avatars instead of face-to-face with other humans, Mursion developed an avatar-based training simulation to build necessary soft skills in a lower stress environment.  Mursion's technology integrates human actors—who voice the avatars—with AI to create the avatar and simulation environment.  This type of technology is referred to as "human-in-the-loop AI."

4.      Since its founding in 2014, Mursion has spent considerable time and resources exploring ways to improve its AI technology and better integrate AI into its simulations.  As Chief Technology Officer, Nagendran was actively involved in and led many of these efforts, which included attempts to use generative AI—in which computers and not human actors generate the conversation—in the simulations and efforts to better automate the avatar experience.

5.      One of Nagendran's principal projects at Mursion was to use AI to develop "conversational analytics" that could measure the effectiveness of a conversation by quantifying traditionally subjective and qualitative aspects of an interaction like rapport, interpersonal effectiveness, and engagement.   Because research indicates that communication is primarily nonverbal, the ability to create measurable so-called "sentiment analysis" would allow users to track and improve this key aspect communication and provide Mursion with a significant leg up on its competitors.

6.      Nagendran also knew of and was actively involved in Mursion's long-term strategic vision to create a generative AI-based simulation product.   Mursion, with its existing technology, customer contracts, and massive data set of prior interactions and conversations, is uniquely positioned to train a Large Language Model—a deep learning algorithm that analyzes vast quantities of data to understand and generate text that can respond to prompts—to create an effective AI-powered training simulator.

7.      While employed at Mursion, Nagendran repeatedly sought to separate his analytics and AI research from Mursion and form a separate company that he would lead.   Mursion repeatedly rejected Nagendran's proposal, and explained that the research belonged to Mursion, and that forming a spin off company would violate his fiduciary duties.   After years of research, Nagendran was purportedly unable to create a commercial application of these analytics for Mursion.

8.      In late 2022, Nagendran decided to resign his position as Chief Technology Officer at Mursion, while remaining a member of the Board of Directors.   Mursion negotiated a generous severance package for Nagendran, which included $175,000 in severance pay, 700,000 stock options, and his continued service as a director—and with it, continued access to Mursion's sensitive and confidential information.   Mursion understood, based on Nagendran's representations and/or omissions, that he was not performing work for any entity that competed with Mursion in avatar-based learning simulations or human-in-the-loop AI, and agreed to execute its Separation Agreement in reliance on that understanding.

9.      Nagendran deceived Mursion.   As he later admitted, Nagendran had begun developing his new entity, Relativ.ai, months before he resigned as Mursion's CTO.   Contrary to

Nagendran's representations, Relativ.ai was a direct competitor to Mursion that used generative AI to create an avatar-based simulation platform to train soft skills—the very product that he knew Mursion was seeking to create. And although he was unable to develop commercial ready "conversational analytics" in his entire tenure at Mursion, Nagendran was apparently able offer such analytics in Relativ.ai's product—which mirrored the research he performed at Mursion—after just months of development. After being admonished by Mursion that he could not create a new and separate entity to apply the AI research he conducted at Mursion, Nagendran simply decided to do it anyway.

10.     In the months after resigning as CTO, Nagendran remained a director at Mursion and continued to owe it fiduciary duties. He also continued to have access to Mursion's work product and confidential information. While still a Mursion director, Nagendran officially founded Relativ.ai and worked on the development of its technology, building a product that was ready to scale for commercial use. Nagendran hid the exact nature of his company and work from Mursion and took pains to explain that his new project did not compete with Mursion in response to inquiries from the company.

11.     Nagendran revealed his deception at Mursion's May 2023 Board of Directors' meeting. During a discussion of Mursion's generative AI strategy, Nagendran played for the Board a demonstration of an avatar-based conversation simulation powered by generative AI. In response to a request from the Board to use the application, Nagendran explained that he could not grant access as it was created as part of his new venture. Nagendran's statement confused and disturbed the Board. Nagendran was a fiduciary to Mursion who had previously promised and represented that he was not pursuing any work that conflicted with the company's interests, yet the product he created for his new venture mimicked the same services Mursion provided and was built using technology that he knew Mursion sought to integrate into its simulations.

12.     When Mursion further investigated Nagendran and his new enterprise, Nagendran admitted that Relativ.ai directly competed with Mursion, in violation of his fiduciary duties as a director. And Nagendran also admitted that he started building this competitor while he was still employed as Mursion's Chief Technology Officer. Instead of remedying his misconduct,

Nagendran proposed that Mursion "collaborate" with and pay Relativ.ai to have access to and use the very technology that Nagendran had worked on and was responsible to produce *for Mursion*. Mursion rejected this self-serving offer.  Nagendran continued to serve as Director—and have access to Mursion's company information—for two months after revealing his deception and disloyalty, before finally resigning from the Board of Directors in July 2023.

13.     To this day, Nagendran and Relativ.ai continue to attempt to profit from Nagendran's breach of fiduciary duties and fraud.  Mursion brings this suit to put an end to this misconduct, disgorge any unjust enrichment gained by Defendants, and to seek damages to remedy the harm Mursion has suffered.

## THE PARTIES

14.     Plaintiff Mursion is a Delaware corporation with its principal place of business at 2443 Fillmore St, Suite 515, San Francisco, California 94115.

15.     On information and belief, Defendant Nagendran is an individual residing at 2585 SW 16th Avenue, Portland, Oregon.

16.     On information and belief, Defendant Relativ.ai is a Delaware Corporation with its principal place of business at 2017 Northwest Vaughn St., Portland, Oregon.

## JURISDICTION AND VENUE

17.     This Court has personal jurisdiction over Defendants because they conduct business in and operate out of California, Defendants directed the conduct giving rise to the Complaint to California and/or engaged in that conduct in California, and Defendants have sufficient minimum contacts to render the exercise by California courts permissible under traditional notions of fair play and substantial justice.  Additionally, Nagendran expressly consented to jurisdiction in California for any action to enforce the Confidentiality and Proprietary Rights Agreement between him and Mursion.

18.     This Court has original subject matter jurisdiction over the trade secrets claims asserted under 18 U.S.C. § 1836(c) and 28 U.S.C. §§ 1331.  This Court has supplemental jurisdiction over the state and common law claims asserted herein pursuant to 28 U.S.C. § 1367 because they are party of the same case or controversy.

19.     Venue is proper in this District under the provisions of 28 U.S.C. § 1391(b)(2) because a substantial portion of the events or omissions giving rise to the claims occurred, and the property relevant to this is situated, in this judicial district.   Moreover, Defendant Nagendran expressly agreed that any action to enforce the Confidentiality and Proprietary Rights Agreement be venued in state or federal court in San Francisco, California.

## FACTUAL ALLEGATIONS

### A.     Mursion's Business

20.     Mursion is an innovative technology company that produces immersive virtual reality simulations to help people, from students to front-line workers to C-suite executives, improve their communication, leadership, and other "soft" skills.   Mursion's users develop better leadership skills, hone their sales abilities, learn how to respond to difficult customer complaints and inquiries, and confront their unconscious biases to foster more diverse and inclusive workplaces by practicing hard and high stakes conversations and interactions with human-powered avatars in virtual reality rooms.

21.     Research shows that, counterintuitively, people prefer to interact with avatars instead of having face-to-face and peer-to-peer role-play, particularly when learning skills or having conversations that are outside of their comfort zones.   According to studies, people are generally more trusting and curious in their interactions with avatars than they would be during in-person role-play with a co-worker.

22.     Mursion designed its training products with that research in mind.   Mursion's customers are able to design trainings with hundreds of different kinds of avatars—of all ages and races—and environments depending on need.   Mursion's users can work with avatars one-on-one or in teams.   And Mursion offers a wide variety of training programs and simulations to improve leadership and management, diversity, equity, and inclusion, sales, customer service, education and classroom skills for teachers, and bedside manner and patient care for healthcare workers.   Users in these avatar-based training sessions feel more psychologically safe and comfortable as they learn— often through trial and error—how to most effectively and empathetically navigate sensitive and fraught situations.

23.     Since its founding in 2014, Mursion's programs have been quite successful. Companies like Ericsson, T-Mobile, Dow Chemical, and H&R Block have used Mursion to train their leaders and workers.  Mursion's work also has received great acclaim—for example, the Financial Times, Fortune, and the Harvard Business Review have all lauded Mursion's efforts to bring interpersonal training into the 21st century.

24.     One of the key drivers of Mursion's success is the way that its technology links and leverages human operators with AI.  Each Mursion simulation is run by a human "Simulation Specialist" who interacts in real-time with the user through one or more avatars.  The Simulation Specialist speaks to the user, offers unique responses and feedback, and evaluates the user's performance.  Mursion uses AI technology to transform the Simulation Specialist into the user-facing avatar.   The AI syncs the Simulation Specialist's verbal and non-verbal cues and communication with the avatar and can also morph the Specialist's voice to allow a single person to play up to five different avatars during a simulation.  The AI also reduces the human cognitive load—the amount of information that a person's working memory can hold at one time—to optimize learning by distilling the interaction to the core activities that will improve the user's skills.  By combining AI technology with the performance of the human Simulation Specialists, Mursion's users get the best of all worlds: the psychological comfort of interacting with an avatar and the authenticity of a real-human interaction.

25.     This type of technology—in which human beings are involved, interact with, and help to train the AI—is commonly referred to as "human-in-the-loop" AI.  As Mursion has grown and developed as a company, its AI technology has taken on a more important and core role in the business.  Over the years, the simulations have grown more reliant on AI.  Many tasks related to the operation of the avatars that were once performed by the Simulation Specialists have now been automated through the use of AI algorithms.

26.     Mursion's success is also built on the data that it has been able to generate from hundreds and thousands of conversation simulations performed on its platform.  Mursion is able to quantify the progress of its users on a client-by-client basis—which provides valuable metrics for its customers to track where and how they have improved and where they need additional training—

and more generally study which modes and methods of communication are most effective.  The latter data set not only allows Mursion to hone its approach and better train its Simulation Specialists, but can be used to measure conversational effectiveness and generate conversations that are wholly generated through AI.

27.     Needless to say, Mursion has spent considerable time, resources, and millions of dollars developing the technology—including the AI—that powers its successful simulators.  This development involves considerable trial and error.  In building its platform, Mursion went through (and continues to go through) multiple iterations, trying, failing, and trying again to accomplish the goal of seamless and effective AI-driven simulation-based learning.  To that end, each of Mursion's products must undergo extensive trials and testing to make sure that they actually work to improve the relevant interpersonal skills.

28.     Building the best product and technology does not, on its own, create a successful business.  Mursion has had to spend millions of dollars and thousands of hours marketing its product to businesses, healthcare providers, and educational institutions.  Through these marketing efforts, Mursion has formed relationships with key customers and has compiled internal intelligence on what methods of marketing work (and do not work), what types of entities are best suited and most interested in Mursion's products, and pricing strategies.

29.     Mursion, as an early stage business, relies on investment capital from various funds and financial institutions.  For nearly a decade, Mursion has compiled and developed sensitive financial information related to the current and projected value of the company and its technology as well the market more generally for the purpose of raising money.  Mursion also has formed relationships with and compiled proprietary information about actual and potential investors to assist in its fundraising efforts.

30.     Given the investment, time, and effort involved in creating Mursion's products, maintaining as confidential information regarding what works and what does not work provides Mursion with substantial value.  This confidential information provides a significant competitive advantage over other firms that also are trying to develop or fund development of artificial intelligence products.  Mursion's proprietary and confidential know-how and trade secrets generated

in the course of its product development, strategy, and marketing efforts are essential elements of its business.

31.     Because this information's value is derived specifically from keeping its secrecy, Mursion takes numerous measures to maintain and protect the confidentiality and secrecy of its confidential information, including, without limitation, requiring its employees, consultants, and advisors to undertake confidentiality agreements and periodically requiring employees to reconfirm compliance with Mursion policies; implementing and enforcing generally applicable employee policies regarding confidentiality and the proper use of Mursion data systems; marking documents as confidential where appropriate; limiting the information it shares without outside partners on a "need to know" basis, and then only under the strictures of a nondisclosure agreement; password protecting Mursion's devices and servers that maintain confidential information; limiting employees' technical access to confidential information (as an officer and director, Nagendran has broad access to Mursion's data); keeping server logs and other data of user access to Mursion's servers; maintaining physical security over Mursion's offices, including through the use of keycards; and other such similar measures, all of which function as reasonable means to protect the confidential and secret status of Mursion's confidential information.

**B.      Mursion Is Founded In 2014 And Nagendran Joins As Chief Technology Officer And Board Member In 2015**

32.     Mursion was founded in 2014 by Chief Executive Officer Mark Atkinson as a commercial spinoff of a University of Central Florida ("UCF") project that used simulators to prepare student teachers to enter K-12 classrooms.

33.     While investigating the potential commercial viability of the simulator product, Mr. Atkinson met Nagendran, who was then working as a research scientist for one of the principal investigators of the UCF project.  Nagendran desired to partner with Mr. Atkinson on the commercial venture and join as Chief Technology Officer.  Nagendran lacked the commercial software experience typical of a software company chief technology officer, but he had otherwise impressive credentials, a passion for the work, intelligence, and ambition.  So Mr. Atkinson decided to hire him.

34.     On or around February 1, 2015, Nagendran began working at the predecessor to Mursion, Amites Inc., as a founding member, CTO, and a member of the Board of Directors.  As CTO, Nagendran was also head of Mursion's research department, giving him both a high-level and granular view into Mursion's products, its business strategy, and its go-to-market strategy.  One of his primary responsibilities was to "[l]ead the effort to invent, investigate and identify leading edge technologies that will continue to make [Mursion] a leading innovator in its field."

35.     As an officer and director, Nagendran owed fiduciary duties—including the duty of loyalty—to Mursion.

36.     Moreover, as a condition of his employment, Nagendran agreed—both when he joined Mursion and later when he renewed the Agreement in November 2020—to be bound by Mursion's Confidentiality and Proprietary Rights Agreement (the "Confidentiality Agreement"). By its terms, the Confidentiality Agreement covered all manner of Confidential Information, ranging from business "strategies" to "potential transactions" to "software designs" to "algorithms, product plans, designs, models, ideas, audiovisual programs, inventions . . ." and "discoveries, experimental processes, experimental results . . . ."  *Id.* at § 1(a).

37.     Pursuant to the Confidentiality Agreement, Nagendran was required to

> "(i) to treat all Confidential Information as strictly confidential and to use a reasonable standard of care in protecting the Confidential Information; (ii) not to directly or indirectly disclose, publish, communicate or make available Confidential Information, or allow it to be disclosed, published, communicated or made available, in whole or part, to any entity or person whatsoever (including other employees of the Employer) not having a need to know and authority . . . (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media or other resources containing any Confidential Information, or remove any such documents, records, files, media or other resources from the premises or control of the Employer . . ."

Confidentiality Agr. § 1(b).  Nagendran agreed to be bound by that covenant "during and after" his employment at Mursion until the "Confidential Information has become public knowledge other than as a result of" (i) Nagendran's "breach of this Agreement," or (ii) a "breach by those acting in concert with" Nagendran.  *Id.* § 1(c).

38.     Nagendran also agreed that "[a]ny action or proceeding by either Party to enforce" the Confidentiality Agreement "shall be brought only in any state or federal court located in the

State of California, in San Francisco, California."  Confidentiality Agr. § 10.  Nagendran agreed to "irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue."  *Id.*

39.    After signing the agreements, Nagendran got to work.  As a startup, Mursion needed all of Nagendran's time, effort, and attention.  During Nagendran's employment at Mursion, he spearheaded Mursion's most important projects.  For example, Nagendran led the team responsible for implementing the artificial intelligence required to drive Mursion's digital avatar's facial and body language.  He also was responsible for research and implementation of Mursion's learning analytics engine, its AI-simulation rendering engine, and its VR efforts.  In return, Mursion rewarded Nagendran with a handsome salary and a generous equity interest in the company.

40.    At all times, Nagendran knew and understood that Mursion was an AI company that competed against other enterprises developing similar AI and AI-connected products.  Nagendran also knew that Mursion was exploring the use of "generative AI"—AI capable of independently generating text, images, and other media in response to prompts—in its simulation products.  Indeed, throughout his career at Mursion, Nagendran dedicated a significant amount of his time and effort toward improving Mursion's AI technology and finding new applications for AI in and relating to Mursion's simulation software.

41.    Early in Nagendran's tenure, for instance, Mursion and Nagendran worked with a company to develop a web-based teacher licensure examination that could be administered using Mursion's simulation technology.  As part of this contract, Mursion and its customer worked to integrate natural language processing ("NLP")—a branch of AI aimed at training computers to understand language as humans do—into Mursion's simulations.  Ultimately, Mursion and the customer concluded that NLP technology was not sufficiently advanced at that time to create the types of authentic interactions needed for teacher training and testing.  However, Nagendran recognized that AI was an integral part of Mursion's present and future.  Mursion continued to pay Nagendran to research the technology to develop ideas for how AI could improve its products.

**C.      Nagendran Attempts To Form A Separate AI Analytics And Research
Company And Is Informed That Doing So Would Violate His Fiduciary Duties**

42.      In 2018 and 2020, Mursion raised investment capital through a Series A and Series B funding round.   As the company grew, Mursion needed top-flight commercial software development to meet the needs of its customers and business strategy, and it became clear that Nagendran could not handle that responsibility.   Despite Mursion's multi-year effort to train Nagendran, which included hiring an experienced software engineer to mentor Nagendran and oversee the day-to-day software development at Mursion while Nagendran improved his abilities, Nagendran was ultimately unable to obtain the technical or management skills necessary to run software development at Mursion.

43.      As a result, over the course of his tenure at Mursion, Nagendran began to spend more time and effort as CTO researching AI and its potential applications to Mursion's products, and less time developing software.

44.      Beginning in 2018, around the time of Mursion's Series A funding round, Nagendran started researching ways to integrate AI into Mursion's simulations to develop new "conversational analytics" that could track whether and why a particular simulated interaction was effective at teaching the desired skill and be used to predict what type of interaction would be most effective in the future.   Mursion essentially sought to use AI to develop a scientific and objective method to quantify an individual's non-verbal conversational skills, an ability that has traditionally been evaluated, if at all, subjectively and qualitatively.

45.      Mursion understood that offering effective analytics that could track a user's progress and provide predictive advice for how a user could most effectively improve his or her engagement and nonverbal skills in high stakes and difficult social interactions could be a game changing development for its business and a key advantage over competitors.   Mursion encouraged Nagendran's research and even hired an AI specialist to tutor Nagendran to help him develop the technical skills in machine learning—the branch of AI focused on developing predictive algorithms to mimic the way that humans learn—required to develop these analytics.

46.     In addition to building these analytic tools, Nagendran knew that Mursion had a long-term strategic interest in creating simulations that were powered entirely by generative AI.  Because Mursion had the existing simulation software, significant customer contracts, and—perhaps most importantly—a voluminous data set of prior interactions that could be used to train a Large Language Model to create an effective and realistic generative AI, Mursion was well positioned and eager to invest in developing and marketing this technology.

47.     Nagendran eventually shifted his full-time attention at Mursion to developing these analytics and other AI-based tools.  In 2020, after Mursion closed its Series B funding round, Mursion and Nagendran mutually agreed to change the scope of his role and responsibilities. Mursion officially removed Nagendran from any role leading commercial software development and hired a new Head of Product and Engineering.  Mursion then tasked Nagendran, along with a team of ten engineers and software developers, to focus on improving Mursion's AI technology— including creating an AI system that would fully automate the simulation avatars—and further develop Mursion's AI analytics.  Mursion intended for Nagendran and his team to collaborate with the new Head of Product and Engineering to leverage the advancement in AI technology with Mursion's traditional commercial software development to build the best and most effective simulation platform possible.

48.     Unfortunately, Nagendran did not uphold his end of the bargain.  He did not collaborate with other Mursion teams, but instead began to treat his group as an autonomous unit separate from the Mursion enterprise.  Nagendran withdrew from Mursion's day-to-day operations and refused to cooperate with the new Head of Product and Engineering.

49.     On multiple occasions, Nagendran sought to officially separate from Mursion entirely.  He repeatedly suggested that Mursion should turn his AI team into an entirely separate analytics company that Nagendran could run on his own.  Mursion rejected each of these suggestions.  Mursion informed Nagendran that he was performing this work on the direction of and on behalf of Mursion and that he owed Mursion and its shareholders fiduciary duties as an officer and director.  Mursion made clear in no uncertain terms that any effort to form a separate AI analytics business would violate these duties.

50.     Despite the time and resources dedicated to this project, Nagendran was ultimately unable to develop any commercial application for the analytics while he worked at Mursion.

**D.     Nagendran Resigns As CTO And Fraudulently Induces Mursion To Execute a Favorable Separation Agreement**

51.     Ultimately, after running the AI portion of Mursion's business for two years, Nagendran sought to leave Mursion, just as AI was gaining widespread attention.

52.     In November 2022, Nagendran sought to resign his position as Mursion's CTO.  He intended to remain a member of the Board of Directors.

53.     Mursion and Nagendran negotiated a severance package and Separation Agreement. Mursion agreed to pay Nagendran generous severance, $175,000 in severance pay and an option to purchase 700,000 shares of stock, based on the understanding and Nagendran's express representations that he was not working for any competitor while he remained an officer, director, and fiduciary of Mursion.

54.     Additionally, as a condition of the Separation Agreement, Nagendran acknowledged and agreed to abide by his "continuing post-employment obligation to refrain from disclosing to any entity that uses avatars for any purpose, either orally or in writing, the underlying technologies or technical properties associated with any of Mursion's past, current, and pending patents, as set forth in your signed 'Confidentiality & Proprietary Rights Agreement.'"

55.     The parties agreed that Nagendran was only resigning from his position as CTO and an officer, but that he would remain a Director at Mursion.  Accordingly, Mursion permitted Nagendran to retain his company-issued laptop and tablet and allowed Nagendran to maintain his access to Mursion's confidential and proprietary information "to the extent necessary to perform [his] board member duties."

56.     Nagendran and Mursion executed the Separation Agreement on or around December 21, 2022.  Mursion timely performed all of its obligations under the Separation Agreement, including making the severance payment.

57.     Mursion agreed and was induced to enter the Separation Agreement based on Nagendran's representations that he was not, at that time, working for any entity that was competing

against Mursion in either AI powered avatar-based simulation products, or human-in-the-loop simulations for training purposes; that he had not and would not disclose any Mursion confidential or proprietary information to a competitor; that he would remain loyal to Mursion as a fiduciary and Director following his resignation; and that he would only use Mursion's information in connection with his duties as a company director.

58.     Nagendran's representations were false.

59.     Unbeknownst to Mursion at the time, beginning in August 2022, Nagendran—while still employed as Mursion's CTO—began work to create his own artificial intelligence company that would use deep learning models to train individuals in various skills using avatar-based simulations.  Nagendran's company, officially founded as Relativ.ai in March 2023, would directly compete with Mursion.  On information and belief, Nagendran used the research and work he performed at Mursion, along with his knowledge of Mursion's existing technology and confidential business and marketing strategies, to create this competitor company.

60.     After being repeatedly admonished that he could not spin off the work he was performing for Mursion into his own separate company, Nagendran decided to do so in secret anyway.

61.     Nagendran knew at the time that that he remained employed at Mursion's and was negotiating his severance agreement that he was actively working for a competitor entity. Nagendran knowingly and actively misled and affirmatively misrepresented to Mursion that he was not working for a competitor or using Mursion confidential and proprietary information in order to induce Mursion to execute the Separation Agreement.

62.     Moreover, as an officer and director, Nagendran had an independent obligation to disclose this information to Mursion.  He violated that obligation by knowingly omitting these material facts.

63.     Mursion was ignorant of these facts at the time it executed the Separation Agreement and was induced to execute the Separation Agreement in reliance on Nagendran's misrepresentations and omissions.

**E.     As A Result Of His Fraud, Nagendran Retains Access To And Misappropriates Mursion's Trade Secrets**

64.     Throughout his tenure as CTO, Nagendran had access to Mursion's most sensitive data, information, and trade secrets.

65.     Mursion took reasonable precautions to protect its trade secrets.  Mursion implemented electronic security measures to ensure that only authorized Mursion personnel could access data, information, and documents on Mursion's internal systems and cloud storage platforms. Mursion employees could access Mursion documents only through Mursion issued-devices—which are password protected—or through express authorization to Mursion's cloud-based document sharing platform.

66.     Mursion also implemented legal security measures.  For instance, all Mursion employees are required to sign and agree to be bound by the company's Confidentiality and Proprietary Rights Agreement as a condition of their employment.  From time-to-time, Mursion requires its employees to execute updated versions of the Confidentiality and Proprietary Rights Agreement during the course of their employment, as necessary.

67.     After Nagendran resigned as CTO, he retained access to Mursion's confidential information, data, and trade secrets.  In reliance on his representation that he would comply with the Confidentiality Agreement and would not compete with Mursion, the company allowed Nagendran to remain a Director and maintain access to Mursion's proprietary information and trade secrets in, and only in, connection with his duties as a Director.

68.     As explained below, Nagendran breached his obligations under the Confidentiality Agreement and misappropriated its trade secrets in order to build a competitor company.

69.     Due to the volume of data at issue, it is impractical to describe every single Mursion trade secret and piece of confidential information that Nagendran misappropriated, accessed through false pretenses, or otherwise stole to launch Relativ.ai.  Nonetheless, the misappropriated trade secrets include—but are not limited to—documents and information from nine categories, eight of which are outlined in the "Transition Plan" Nagendran authored in November 2022.  These categories are:

- Mursion's development of audio-based artificial intelligence to drive avatar's facials and body language;

- Mursion's internal software architecture and source code, including its engines and plugin system;

- Mursion's development of learning analytics;

- Mursion's simulation analytics platform, including the development of algorithms that use AI to predict conversational outcomes based on the extraction of audio and visual data;

- Mursion's development of post-simulation review and automated surveys;

- Mursion's development of AI-based rendering of live simulations;

- Mursion's integration of its simulations with virtual reality devices;

- Mursion's development of optimizer-based algorithms to maximize the scheduling of simulations with clients;

- Mursion's research and development of generative AI-based simulations utilizing natural language processing, including but not limited to the research described in paragraph 41 *supra*.

The misappropriated trade secrets include both the products and research Mursion was actively developing in these nine categories and its so-called negative know-how—its identification of methods, processes, and products that do not work based on its years of research.

**F.    Nagendran Reveals That He Founded A Company To Directly Compete With Mursion While Still Owing Mursion Fiduciary Duties As An Officer And Director**

70.     In May 2023, Mursion held its second quarter Board of Directors' meeting. Nagendran, who remained a director at the time, attended virtually via Zoom.  This was the first Board meeting that Nagendran attended since his separation in December 2022.

71.     Prior to the May 2023 Board of Directors' meeting, Mursion employees had learned that Nagendran formed a new business, Relativ.ai.  Nagendran informed the Mursion employees that his new company was working with former educators to perform "semantic analysis" of conversations to measure their effectiveness.  He made clear in these conversations that his new

entity was not performing the type of "sentiment analysis" that he worked on at Mursion. Furthermore, he made no reference to using avatar-based simulations at his new venture.

72.     At the May 2023 Board of Directors' meeting, the members of Mursion's Board continued its ongoing discussion of Mursion's long-term strategy to integrate generative AI into its simulation products—a strategy that had become more urgent in light of the rapid advancement of generative AI technology.

73.     During this exchange, Nagendran showed the Mursion Board a working demonstration of a Mursion avatar having a conversation with a user in which the avatar's communications were powered by generative AI.

74.     The Mursion Board was extremely impressed by the demonstration, which the directors believed had been developed by an unknown third-party, and agreed that Mursion should urgently explore the application of generative AI to its product.

75.     Following the meeting, a Mursion employee and director contacted Nagendran and asked if he could share the application he used for his demonstration.  Nagendran, to Mursion's surprise and concern, explained in an email that the application was "part of some new ventures I'm involved in, so can't be shared."

76.     Nagendran's message revealed that he was working on a product that appeared to directly compete with Mursion's avatar-based simulation training products.  This revelation was shocking—Nagendran remained a director of, and fiduciary to, Mursion and had repeatedly represented that he and his new venture did not compete with Mursion.

77.     Mursion immediately started to investigate Nagendran's new venture.  In late May 2023, Mursion's CEO met with Nagendran.  During this meeting, Mursion's CEO noted that Mursion's business provided simulations for training on soft skills using avatars, and asked whether Nagendran at Relativ.ai were developing similar simulation technology that could be used for the same purpose.  Nagendran admitted that he was.  Mursion's CEO explained that Relativ.ai was therefore directly competitive with Mursion, and Nagendran conceded that it was.

78.     During the conversation, Nagendran falsely stated that he thought he was not competing with Mursion because he had understood that Mursion was not interested in generative

AI technology.  In reality, Nagendran knew that Mursion had, since shortly after its founding, explored how it could incorporate generative AI into its simulations.  In fact, Nagendran was a key part of that investigation.

79.    Nagendran also admitted in this conversation that he had been working on his competitor product for more than nine months and that, as a result, the technological infrastructure was so highly developed that he could shortly deploy it at scale.  Nagendran had only resigned as Mursion's CTO five months before the conversation.  As a result, the admission meant he had also admitted that he created the competitor company and started to develop the technology while he was still employed full-time at Mursion.  Indeed, it appears that he dedicated the last four months of his employment as C-suite officer at Mursion to misappropriating Mursion's trade secrets to build his new competitive venture.

80.    The product that Nagendran intends to launch at Relativ.ai not only competes directly with Mursion but is based on the same proprietary work and research of AI-based conversational analytics that Nagendran spent years conducting—and Mursion spent millions of dollars funding— at Mursion.

81.    An image from Relativ.ai's website describing its product shows that it is an avatar-based simulator used for "soft-skills training scenarios via role-play" that provides "personalized feedback . . . via reports including sentiment, listening skills, empathic response" by analyzing "conversational dynamics to extract insights."



82.    This product, and accompanying conversational analytics, is almost exactly what Nagendran was responsible for developing at Mursion.





83.     Although Nagendran was purportedly unable to develop a commercial application of the AI driven sentiment analysis and conversational analytics after years of research and investment at Mursion, he was apparently able to create and launch a commercial product using this technology and Mursion's trade secrets at his new venture, Relativ.ai, after just nine months.

84.     At the time that they used Mursion's trade secrets to develop Relativ.ai's competing product, both Nagendran and Relativ.ai knew that Nagendran acquired the trade secrets in connection with his employment at Mursion, pursuant to the terms of the Confidentiality Agreement, and in connection with his duties a fiduciary to Mursion as both an officer and director of the company, all circumstances giving rise to a duty to maintain the secrecy of the trade secrets. Additionally,  Defendants knew at the time that they used Mursion's trade secrets that Nagendran owed duties to Mursion to maintain the secrecy of the trade secrets both under the terms of the Confidentiality Agreement and pursuant to his fiduciary duties as an officer and director of Mursion.

**G.      Nagendran Resigns From Mursion's Board Of Directors And Interferes With Mursion's Access To Its Company Information And Computer Systems**

85.     After the May 2023 Board of Directors' meeting and subsequent discussions with Nagendran, Mursion made clear to Nagendran that his operation of Relativ.ai directly competed

with Mursion, appeared to be based on Mursion information and know-how, and violated Nagendran's fiduciary duties and contractual obligations.

86.     Instead of seeking to remedy this misconduct, Nagendran first sought to be rewarded for his disloyalty and contractual breaches by proposing that Mursion "collaborate" with Relativ.ai and pay Nagendran to use the technology that he was supposed to be developing (and was compensated for developing) at Mursion in the first place.  Mursion rejected Nagendran's self-serving proposal.

87.     In response, Nagendran resigned from Mursion's Board of Directors on July 28, 2023.

88.     After resigning, Nagendran retained his Mursion issued laptop computer and iPad, which he was permitted only to use in connection with his duties as a director, and as a result retained access to Mursion's confidential company information.

89.     On August 11, 2023, Mursion demanded that Nagendran return all of his company-issued devices and informed him that he had a duty to preserve all documents, data, and information in his possession that related to his employment and ongoing dispute with Mursion.

90.     On August 21, 2023, Nagendran—through counsel—represented that he would return all Mursion devices in his possession but claimed to not have a complete accounting of the company-devices issued to him.  Mursion provided Nagendran with the list of devices issued to him and identified the laptop by serial number.

91.     Nagendran purported to return Mursion's laptop and iPad on or around August 30, 2023.  However, the devices were password and passcode protected and Nagendran did not provide the credentials necessary for Mursion to access its computer systems.  Moreover, the serial number on the laptop that Nagendran returned did not match the serial number of the laptop that, according to company IT records, Mursion issued to Nagendran.

92.     Mursion requested that Nagendran provide it with the passwords and passcodes so that Mursion and its authorized users could access the data processing and data storage on its devices.

93.     Nagendran refused to provide the credentials and claimed that he no longer possessed the passwords and passcodes needed to access the computer systems.

94.     Nagendran's claim that he did not possess the credentials needed to access the computer systems was false.  In October, after refusing for more than a month to provide the password to the laptop, Nagendran finally relented and turned it over.  Nagendran still refused to provide a passcode for the iPad.

95.     Nagendran's delay in providing necessary credentials to access his Mursion-issued laptop and iPad knowingly and without permission interfered with the use of the computer services to the authorized users of these computers.

96.     Worse, upon reviewing the contents of the devices following receipt of the credentials, Mursion discovered that on August 22, 2023—one day after agreeing to return the devices to Mursion—Nagendran deleted a number of files titled "Master Folio" from the laptop. Mursion is unable to access this data as a result of Nagendran's unauthorized deletion.

97.     Nagendran continues to deny Mursion access to its computer systems.   On information and belief, Nagendran continues to possess and has refused to return all of his Mursion-issued devices, including the company computer on which he performed most of his work.  First, according to a preliminary analysis of the returned laptop, the device was rarely used and did not contain many work-related files.  This is inconsistent with Nagendran's representation that the laptop he returned was his Mursion work computer.  Second, according to Mursion's records, Nagendran was issued a different laptop with a different serial number.  That laptop has not been returned.  To this day, Nagendran has refused to return any other Mursion-issued devices.

**H.     Nagendran's Actions Have Harmed and Will Continue to Harm Mursion**

98.     Mursion developed its Confidential Information at great expense and effort as a result of years of research, experimentation, and trial-and-error.  Many of Mursion's competitors have greater financial, technical, infrastructure, and personnel resources than Mursion.  Accordingly, Mursion's ability to compete successfully depends largely on its ability to leverage its experience and to obtain and protect Confidential Information and technologies it develops.

99.    Mursion has suffered and continues to suffer irreparable harm from Nagendran's actions.  Among other things, Nagendran's misappropriation of Mursion's Confidential Information and, on information and belief, his use of that Confidential Information to benefit third parties, such as Relativ.ai, presents an ongoing risk that Mursion's Confidential Information has been compromised.  Further, Nagendran's usurpation of Mursion's rightful corporate opportunity— embodied in Relativ.ai—presents an ongoing harm to Mursion.  As Nagendran agreed in the Confidentiality Agreement, Mursion does not have an adequate remedy at law for this harm and is entitled to injunctive and equitable relief in addition to damages.

**FIRST CAUSE OF ACTION**

**Breach of Fiduciary Duty**

**Against Defendant Nagendran**

100.    Mursion incorporates all of the above paragraphs as though fully set forth herein.

101.    As an officer and director at Mursion, and given the duties and obligations Nagendran accepted toward Mursion, and in light of the trust that Mursion placed in Nagendran, Nagendran owed Mursion a duty of undivided loyalty and was obligated to act as its fiduciary with the utmost good faith, and in the best interests of Mursion.

102.    Mursion was entitled to place its trust and confidence in Nagendran and to expect him to act with the utmost good faith toward it in carrying out Mursion's business.  Mursion relied on Nagendran's loyalty and integrity and his faithful performance of his duties and responsibilities.

103.    Nagendran took advantage of Mursion's faith in him by not performing the duties he owed to Mursion, by acting in conflict of interest, by engaging in business for his own account, and by concealing his improper conduct.

104.    Nagendran knowingly and willingly breached his fiduciary duty and duty of loyalty to Mursion by (i) misappropriating Mursion's Confidential Information, for Relativ.ai and himself, and by making efforts to conceal that conduct; (ii) working for and creating Relativ.ai while he served as an officer at Mursion, thus improperly dividing his time and attention away from Mursion; (iii) usurping a corporate opportunity from Mursion in the form of Relativ.ai's generative AI model

based on large language modeling and conversational analytics; and (iv) as an officer and director, working to set up a competing business, Relativ.ai.

105.    As a direct and proximate result of Nagendran's disloyalty, Mursion has been and continues to be harmed.  Mursion is entitled to damages, in an amount to be determined at trial, as well as disgorgement, and forfeiture and return of all monies and compensation paid during this period of disloyalty, the exact amount to be determined at trial.

106.    Mursion is further entitled to injunctive relief against Nagendran and all those acting in concert or participation with him, remedying their past improper conduct, and preventing such conduct in the future.

107.    Nagendran acted in a wanton, willful, and outrageous manner in breaching his fiduciary duties and duty of loyalty to Mursion.  Nagendran's conduct as alleged above was outrageous, demonstrating an evil motive and reckless indifference to Mursion's rights, entitling Mursion to enhanced and/or punitive damages in the amount to be proven at trial.

108.    Mursion's remedy at law is inadequate to compensate for the harm Nagendran has done.  Mursion therefore seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its Confidential Information and to protect other legitimate business interests.  Mursion's business operates in a competitive market and will continue to suffer irreparable harm absent injunctive relief.

109.    Unless restrained, Defendants will continue to inflict irreparable injury upon Mursion through their violations of Nagendran's fiduciary duties and duty of loyalty to Mursion.  Accordingly, Mursion is entitled to injunctive relief preventing Nagendran from continuing to misuse and/or misappropriate Mursion's property or otherwise engaging in acts detrimental to Mursion.

### SECOND CAUSE OF ACTION

**Aiding and Abetting Breach of Fiduciary Duty**

**Against Defendant Relativ.ai**

110.    Mursion incorporates all of the above paragraphs as though fully set forth herein.

111.    As of March 2023, Defendant Nagendran was an officer and director of and controlled Relativ.ai.  Accordingly, Nagendran's conduct and knowledge is imputed to Relativ.ai by operation of law.

112.    As an officer and director at Mursion, and given the duties and obligations Nagendran accepted toward Mursion, and in light of the trust that Mursion placed in Nagendran, Nagendran owed Mursion a duty of undivided loyalty and was obligated to act as its fiduciary with the utmost good faith, and in the best interests of Mursion.

113.    Nagendran knowingly and willingly breached his fiduciary duty and duty of loyalty to Mursion by (i) misappropriating Mursion's Confidential Information, Relativ.ai, and himself, and by making efforts to conceal that conduct; (ii) usurping a corporate opportunity form Mursion in the form of Relativ.ai's generative AI model based on large language modeling and conversational analytics; and (iii) as a director, working to set up a competing business, Relativ.ai.

114.    Relativ.ai knowingly participated in the above breaches through the conduct of its agent, officer, and director Nagendran.

115.    As a direct and proximate result of Relativ.ai's conduct Mursion has been and continues to be harmed.  Mursion is entitled to damages, in an amount to be determined at trial, as well as disgorgement from Defendants, and forfeiture and return of all monies and compensation paid to them during this period of disloyalty, the exact amount to be determined at trial.

116.     Mursion is further entitled to injunctive relief against Relativ.ai and all those acting in concert or participation with it, remedying their past improper conduct, and preventing such conduct in the future.

117.    Relativ.ai acted in a wanton, willful, and outrageous manner in aiding and abetting Nagendran's breach his fiduciary duties and duty of loyalty to Mursion.  Relativ.ai's conduct as alleged above was outrageous, demonstrating an evil motive and reckless indifference to Mursion's rights, entitling Mursion to enhanced and/or punitive damages in the amount to be proven at trial.

118.    Mursion's remedy at law is inadequate to compensate for the harm Relativ.ai has done.  Mursion therefore seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its Confidential Information and to protect other legitimate

business interests.  Mursion's business operates in a competitive market and will continue to suffer irreparable harm absent injunctive relief.

119.   Unless restrained, Relativ.ai will continue to inflict irreparable injury upon Mursion through their violations of Nagendran's fiduciary duties and duty of loyalty to Mursion. Accordingly, Mursion is entitled to injunctive relief preventing Nagendran from continuing to misuse and/or misappropriate Mursion's property or otherwise engaging in acts detrimental to Mursion.

### THIRD CAUSE OF ACTION

### Fraud Against Defendant Nagendran

120.   Mursion incorporates all of the above paragraphs as though fully set forth herein.

121.   In or around December 2022 and through to May 2023, Nagendran made false representations of material facts to Mursion or otherwise omitted material facts from Mursion regarding his work for any entity that was competing against Mursion in either AI, avatar-based simulation products, or human-in-the-loop simulations for training purposes; his past or planned disclosure any Mursion confidential or proprietary information to a competitor; his past or planned disloyalty to Mursion; and his intention to Mursion's information outside the scope of his duties as a company director.

122.   At the time Nagendran made these false representations and/or omissions of material facts to Mursion, Nagendran owed Mursion an independent duty of disclosure as an officer, director, and therefore fiduciary of Mursion.

123.   Nagendran knew that these misrepresentations and omissions of material facts were false or misleading at the time that they were made as demonstrated by the fact that Nagendran had, since August 2022, been creating Relativ.ai, a third-party company that directly competed against Mursion in AI, avatar-based simulation products, or human-in-the-loop simulations for training purposes and was built on technology and research developed by Mursion, as well as Mursion's confidential information.  At the time he made the false misrepresentations of and fraudulently omitted these material facts, Nagendran knew that he intended to continue to work for Relativ.ai and to use Mursion's confidential information and know-how in support of that work.

124.   Nagendran made these false statements and fraudulently omitted these material facts with the intent to, among other things, induce Mursion to execute the Separation Agreement and pay Nagendran $175,000 in severance, provide Nagendran the option to purchase 700,000 company shares, and permit Nagendran to maintain access to confidential Mursion company information as a director.

125.   Mursion was ignorant of the false statements and omitted material facts and justifiably relied on Nagendran's misrepresentations and omissions by executing the Separation Agreement, paying Nagendran $175,000 in severance, providing Nagendran the option to purchase 700,000 company shares, and permitting Nagendran to maintain access to confidential Mursion company information as a director.

126.   Nagendran's conduct was oppressive, fraudulent, and/or malicious, entitling Mursion to enhanced and/or punitive damages in the amount to be proven at trial.

127.   As a direct and proximate result of Nagendran's misconduct, Mursion has suffered harm and damages in an amount to be proven at trial.

128.   In the alternative, Nagendran's fraud rendered the Separation Agreement void, entitling Mursion to rescission, restitution, disgorgement, and other appropriate relief.

### **FOURTH CAUSE OF ACTION**

**Violation of California Computer Crimes Laws (Cal. Penal Code § 502(c))**

**Against Defendant Nagendran**

129.   Mursion incorporates all of the above paragraphs as though fully set forth herein.

130.   Mursion, a company headquartered in California, purchased and issued various computer devices, including laptops and an iPad, to Nagendran to be used for Mursion company purposes.

131.   The laptops and iPad are devices that contain computer programs, electronic instructions, input data, and output data, that performs functions, including, but not limited to, logic, arithmetic, data storage and retrieval, communication, and control and thus are "Computer Systems" as defined under Cal. Penal Code section 502(b)(5).

132.    The laptops and iPad, purchased by a company headquartered in California, meant for use in California, and connected to other Mursion computer systems in California, are California computer systems.

133.    Nagendran violated Cal. Penal Code section 502(c) by, among other things, knowingly and without permission disrupting and denying computer services to authorized users of the laptop and iPad by knowingly refusing to provide the necessary credentials that would allow Mursion, the owner of the devices at issue and authorized user, to access the laptop and iPad for months after his resignation from Mursion and deleting materials from the devices prior to returning them to Mursion.

134.    On information and belief, Nagendran has also violated Cal. Penal Code section 502(c) by refusing to return other Mursion-issued devices, including a laptop computer, thereby knowingly and without permission disrupting and denying computer services to authorized users of the laptop.

135.    As a direct and proximate result of Nagendran's wrongful conduct, Mursion has been harmed and sustained damages in an amount to be proven at trial.

136.    As a direct and proximate result of Nagendran's wrongful conduct, Mursion has been irreparably harmed and continues to suffer irreparable harm by having been—and continuing to be—excluded from accessing and using its computer systems and by being deprived of access to data that Nagendran intentionally deleted from Mursion's computer systems.  This harm cannot be adequately remedied at law unless Nagendran and all other persons acting in concert with him is enjoined from engaging in further misconduct and mandated to return to Mursion all of its computers, computer systems, data and the credentials necessary to access them.

## **FIFTH CAUSE OF ACTION**

### **Breach of Contract–Confidentiality Agreement**

### **Against Defendant Nagendran**

137.    Mursion incorporates all of the above paragraphs as though fully set forth herein.

138.     As alleged above, Mursion and Nagendran undertook the Confidentiality Agreement in connection with Nagendran's employment at Mursion.   The terms of the Confidentiality Agreement were sufficiently clear that the parties understood what each of them was required to do.

139.     Mursion has performed all promises, obligations, and conditions imposed on it under the Confidentiality Agreement, except those excused by law or otherwise.

140.     In material breach of his contractual obligations under the Confidentiality Agreement, Nagendran, on information and belief, (i) shared Confidential Information with third-parties, including but not limited to Relativ.ai; and (ii) misappropriated Confidential Information and failed to return that information upon his resignation from Mursion.

141.     As a direct and proximate result of that breach, Mursion has suffered extensive damages in an amount to be determined at trial.

142.     Nagendran's breach of the Confidentiality Agreement has caused, and will cause, irreparable harm to Mursion for which damages would not be an appropriate remedy.   Therefore, Mursion should be granted injunctive relief in addition to any other remedies and without any requirement to post bond.

**SIXTH CAUSE OF ACTION**

**Misappropriation of Trade Secrets, Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.***

**Against All Defendants**

143.     Mursion incorporates all of the above paragraphs as though fully set forth herein.

144.     As set forth above, Defendants improperly acquired, retained, and used confidential and proprietary information of Mursion constituting trade secrets as defined by 18 U.S.C. § 1839(3), including source code, algorithms AI-based analytical tools, and negative know-how gained from years of research and development in generative AI.   These trade secrets pertain to Mursion's core product and business model: the development, operation, and sale of avatar-based conversation simulations that operate using AI-technology.

145.     These trade secrets include the following categories of information:

- Mursion's development of audio-based artificial intelligence to drive avatar's facials and body language;

- Mursion's internal software architecture and source code, including its engines and plugin system;

- Mursion's development of learning analytics;

- Mursion's simulation analytics platform, including the development of algorithms that use AI to predict conversational outcomes based on the extraction of audio and visual data;

- Mursion's development of post-simulation review and automated surveys;

- Mursion's development of AI-based rendering of live simulations;

- Mursion's integration of its simulations with virtual reality devices;

- Mursion's development of optimizer-based algorithms to maximize the scheduling of simulations with clients;

- Mursion's research and development of generative AI-based simulations utilizing natural language processing, including but not limited to the research described in paragraph 41, *supra*.

146.   Mursion's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means, by other persons in the field. They are also the product of years of research and development at substantial cost to Mursion.

147.   Mursion has undertaken reasonable efforts to maintain the secrecy of the trade secrets at issue.  Those efforts include, but are not limited to, the use of passwords and encryption to protect data on its computers and servers, limiting distribution of trade secret information  to employees on a need-to-know basis only, and labeling trade secret documents with appropriate designations. Mursion also maintains written policies and procedures that instruct employees regarding their duties to maintain the secrecy of Mursion's trade secrets, and requires the use of confidentiality and non-disclosure agreements when working with vendors, customers, partners, contractors, and employees to maintain the secrecy of Mursion's trade secret information.

148.   Defendants misappropriated Mursion's trade secrets by improperly acquiring and retaining them through Nagendran's fraudulent misrepresentations to Mursion in connection with his resignation from his role at CTO and by using them to create a competitor avatar-based conversation simulation service in breach of Nagendran's Confidentiality Agreement with Mursion.

149.    In addition, Defendants improperly used Mursion's trade secrets in violation of Nagendran's Confidentiality Agreement with Mursion, launching Realtiv.ai in a fraction of the time it otherwise would have taken.  Defendants knew at the time they used Mursion's trade secrets that Nagendran had acquired them in connection with his employment at Mursion, pursuant to the terms of the Confidentiality Agreement and his duties a fiduciary to Mursion as both an officer and director of the company, all circumstances giving rise to a duty to maintain the secrecy of the trade secrets. Additionally, Defendants knew at the time that they used Mursion's trade secrets that Nagendran owed duties to Mursion to maintain the secrecy of the trade secrets both under the terms of the Confidentiality Agreement and pursuant to his fiduciary duties as an officer and director of Mursion.

150.    Particularly given that Nagendran has refused to provide the devices he used for his day-to-day work at  Mursion, discovery likely will provide additional evidence that Mursion's trade secrets have been improperly used by Relativ.ai.

151.    Defendants improper acquisition and use of Mursion's trade secrets, actual or threatened, violates the Defend Trade Secrets Act.

152.    As a direct and proximate result of Defendants' conduct, Mursion has been injured, and will continue to suffer injury, in an amount that will be proven at trial.  Mursion has also incurred, and will continue to incur, damages, costs, and expenses, including attorneys' fees, as a result of Defendants' misappropriation.  Additionally, as a proximate result of their misappropriation of Mursion's trade secrets, Defendants have been unjustly enriched.

153.    As described herein, Defendants' conduct has been willful and malicious, justifying an award of exemplary damages.  Defendant Nagendran intentionally made fraudulent misrepresentations to retain his access to Mursion's trade secrets and intentionally misappropriated them to create a competitor in violation of his Confidentiality Agreement with Mursion and in breach of his fiduciary duties to the company.

154.    Defendants' conduct constitutes misappropriation of a continuing nature, for which Mursion has no adequate remedy at law.  Unless and until enjoined and restrained by order of this Court, Defendants may continue to use Mursion's trade secret information to enrich themselves.

Mursion is entitled to an injunction against Defendants' actual and threatened misappropriation of trade secrets.

## SEVENTH CAUSE OF ACTION

### Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*

### Against All Defendants

155.    Mursion incorporates all of the above paragraphs as though fully set forth herein.

156.    Mursion has standing to bring a cause of action for statutory unfair competition because it has suffered actual injuries and suffered financial harm as a result of Defendants' unlawful, unfair, and fraudulent business practices.

157.    Defendant Nagendran engaged in unlawful business acts including, but not limited to, breaching fiduciary duties to Mursion, defrauding Mursion, violating Cal. Penal Code section 502(c), violating 18 U.S.C. § 1839, and breaching the Confidentiality Agreement as set forth in this Complaint.

158.    Defendant Relativ.ai engaged in unlawful business acts including, but not limited to, breaching aiding and abetting Nagendran's breach of fiduciary duties to Mursion.

159.    Defendants engaged in unfair business acts as set forth in this Complaint.

160.    As a direct and proximate cause of Defendants' misconduct, Defendants have been unjustly enriched at Mursion's expense and Mursion is entitled to disgorgement of Defendants' profits based on their unlawful, unfair, and fraudulent conduct in an amount to be proved at trial.

161.    Defendants' violation of California's Unfair Competition Law has and will continue to cause irreparable harm to Mursion.  Accordingly, Mursion is entitled to injunctive relief pursuant to Cal. Bus & Prof. Code section 17203.

## PRAYER FOR RELIEF

WHEREFORE, Mursion prays for judgment against Defendants Arjun Nagendran and Relativ.ai, Inc. as follows:

    a.    Judgment in Mursion's favor and against Defendants on the causes of action alleged herein;

    b.    For an award of damages in an amount to be determined at trial;

1        c.        Rescission of the Separation Agreement;

2        d.        For equitable and injunctive relief;

3        e.        Restitution against Defendants and in favor of Mursion, including disgorgement of

4                any wrongfully obtained profits or pecuniary gain;

5        f.        For attorney fees;

6        g.        For costs of suit;

7        h.        For punitive damages;

8        i.        For prejudgment and post-judgment interest according to law; and

9        j.        For such other and further relief as the court may deem just and proper.

10

11                    **<u>DEMAND FOR JURY TRIAL</u>**

12        Mursion demands a trial of its claims by jury to the extent authorized by law.

13

14  DATED: December 11, 2023      Respectfully Submitted,

15                    QUINN EMANUEL URQUHART &

16                    SULLIVAN, LLP

17

18                    By:  */s/ Victoria B. Parker*

19                    Ellyde R. Thompson

20                    Victoria B. Parker
Alex Bergjans

21                    *Attorneys for Plaintiff*
*Mursion, Inc.*

22

23

24

25

26

27

28